In re KMART CORPORATION, et al., Debtors.

Kmart Corporation, Plaintiff,

v.

Intercraft Company, Defendant.

In re Kmart Corporation, et al., Debtors.

Kmart Corporation, Plaintiff,

v.

Newell Rubbermaid Incorporated, Defendant.

In re Kmart Corporation, et al., Debtors.

Kmart Corporation, Plaintiff,

v.

Anchor Hocking Corp., Defendant.

Bankruptcy No. 02 B 2474.
Adversary Nos. 03 A 1814,
03 A 1815, 03 A 1817.

United States Bankruptcy Court, N.D. Illinois, Eastern Division.

May 18, 2004.

---

Jamie S. Casell, Reno, Zahm, Folgate, Lindberg & Powell, Rockford, IL, Andrew Brozman, Chadbourne & Parke, LLP, New York, NY, for defendants.

John R. Steiger, Quinn, Emanuel, Urquhart, Oliver & Hedges, LLP, Los Angeles, CA, William J. Barrett, Barack, Ferrazzano, Kirschbaum, Perlman & Nagelberg, LLC, Chicago, IL, for plaintiff.

## MEMORANDUM OPINION

SUSAN PIERSON SONDERBY, Bankruptcy Judge.

This matter comes before the court on the motions of Intercraft Company, Newell Rubbermaid Incorporated and Anchor Hocking Corp., defendants in the above-captioned adversary proceedings (collectively, the "Defendants")[1], for summary judgment. For the reasons stated herein, the motions are denied.

## I.

### JURISDICTION AND VENUE

This court has jurisdiction over this matter pursuant to 28 U.S.C. § 157(a), 28 U.S.C. § 1334, and Internal Operating Procedure 15 of the United States District Court for the Northern District of Illinois.

---

1. The Defendants describe themselves as being part of the Newell Rubbermaid family of companies.

This matter is a core proceeding pursuant to 28 U.S.C. § 157(b)(2)(F). Venue lies in this court pursuant to 28 U.S.C. §§ 1408 and 1409.

## II.

## BACKGROUND

### A. *General*

On January 22, 2002 (the "Petition Date"), Kmart Corporation and thirty-seven affiliates (collectively, the "Debtors") filed voluntary petitions for reorganization under chapter 11 of title 11 of the United States Code (the "Code"). On April 15, 2002, the Debtors filed Consolidated Schedules of Assets and Liabilities and Statement of Financial Affairs. Schedule 3a of the Consolidated Schedules contains a 573–page listing of over 159,000 payments, aggregating approximately $8.2 billion, made by the Debtors to numerous recipients in the 90–day period preceding the Petition Date. One of the Defendants, Intercraft is included in Schedule 3a as the recipient of a possible preferential transfer in the amount of $5,699.00. Neither of the remaining Defendants, i.e., Anchor Hocking and Newell Rubbermaid, is included in Schedule 3a's list of potential preference recipients.

On February 25, 2003, this court entered an Order approving the Debtors' Disclosure Statement (the "Disclosure Statement Order") with respect to the First Amended Joint Plan of Reorganization (the "Plan"). The Disclosure Statement Order provided, *inter alia*, that: (i) the deadline for casting ballots for accepting or rejecting the Plan was April 4, 2003 (the "Ballot Deadline");

(ii) the deadline for filing objections to confirmation of the Plan was April 4, 2003 (the "Plan Objection Deadline"); and (iii) the hearing on confirmation of the Plan would take place on April 14–15, 2003 (the "Confirmation Hearing").

On April 8, 2003 (four days after the Plan Objection Deadline and Ballot Deadline), Kmart sent the Defendants separate letters, each signed by Kmart's then Chief Restructuring Officer (the "Preference Demand Letters"), demanding the return of alleged preferential transfers.[2] The Preference Demand Letters stated, in part:

> We have completed an extensive review of preference claims involving your company ... If you are interested in resolving this preference claim prior to the commencement of litigation, contact [Kmart's counsel] by no later than 5:00 p.m. Central time on Friday, April 11, 2003.

On April 11, 2003, the Defendants' counsel sent an e-mail to Kmart's counsel, which stated, in part:

> This letter follows our telephone conversation of earlier today regarding the offers made by Kmart to settle preference claims ... You also advised that, while avoidance actions ... will not be commenced today, in the event we are unable to resolve the above-referenced claims by the "Effective Date," pursuant to the Plan, if confirmed next week, avoidance actions will need to be commenced prior to the Effective Date, in order to preserve Kmart's rights. You also advised that the Effective Date may be as early as the end of April.

---

**2.** The demand letter to Intercraft requested the return of $2.1M in alleged preferences, while the complaint against Intercraft seeks recovery of approximately $17M in alleged preferences; the demand letter to Anchor Hocking requested the return of $3.9M in alleged preferences, while the complaint seeks recovery of approximately $14M; and the demand letter to Newell Rubbermaid requested the return of $5.1M, while the complaint seeks recovery of approximately $22M.

The Defendants did not cast ballots or file objections to confirmation of the Plan and none of them appeared at the Confirmation Hearing. On April 23, 2003, this court entered its Findings of Fact, Conclusions of Law, and Order Under 11 U.S.C. §§ 1129(a) and (b) and Fed. R. Bankr.P. 3020 Confirming the First Amended Joint Plan of Reorganization of Kmart Corporation and its Affiliated Debtors and Debtors–in–Possession, as Modified (the "Confirmation Order").

The effective date of the Plan occurred on May 6, 2003 (the "Effective Date"). On May 2, 2003 (nine days after confirmation of the Plan and four days before the Effective Date), the reorganized Kmart (hereafter, "Kmart") filed nineteen adversary complaints, including those against the Defendants, seeking the recovery of alleged preferential transfers pursuant to sections 547 and 550 of the Code. A twentieth preference complaint was filed by Kmart on May 5, 2003.

On May 30, 2003, the Defendants filed their Answers and Affirmative Defenses and on June 10, 2003, they filed motions for summary judgment pursuant to Rule 56 of the Federal Rules of Civil Procedure, made applicable herein by Rule 7056 of the Federal Rules of Bankruptcy Procedure. Except for the particulars regarding specific payments to the respective Defendants, the motions in each of the adversary proceedings are identical. They all seek summary judgment based on arguments that the complaints are barred by *res judicata* and that the complaints are not "within the purview of Sections 547 or 550 of the Bankruptcy Code." Those two arguments

are asserted in the Defendants' first and eighth affirmative defenses, respectively.

The Defendants contend that the "allowance under the Plan of the claims of preference-bearing Class 5 Trade Vendor claimants was fully and completely adjudicated and embraced in the 'final judgment' of the Confirmation Order," which because of the Plan's waiver of Avoidance Claims, "necessarily determined that the claim of a preference-bearing Class 5 claimant was an 'allowed claim,' notwithstanding the contrary mandate of Section 502(d) of the Code."[3] Intercraft's Memorandum of Law in Support of Motion for Summary Judgment, page 2. In other words, the Defendants assert that the waiver of Avoidance Claims in the Plan, which was approved by the Confirmation Order, permitted the Class 5 Trade Vendors to retain the preferences that would have otherwise been subject to disgorgement in accordance with section 502(d). Arguably then the claims of the Class 5 Trade Vendors became allowed on the Effective Date when the waiver of Avoidance Claims became effective. By bringing a preference complaint now, Kmart is relitigating the allowed claim and is thus violating the principle of *res judicata* which forbids relitigation of claims allowed by final order. In a corollary *res judicata* argument, the Defendants contend that the Plan provision retaining certain causes of action did not effectively protect these preference actions from the preclusive effect of *res judicata*.

The Defendants also assert that Kmart's prosecution of these adversary complaints is "beyond the appropriate exercise of a

**3.** Section 502(d) of the Code provides, "Notwithstanding subsections (a) and (b) of this section, the court shall disallow any claim of any entity from which property is recoverable under section 542, 543, 550, or 553 of this title or that is a transferee of a transfer avoidable under section 522(f), 522(h), 544, 545,

547, 548, 549, or 724(a) of this title, unless such entity or transferee has paid the amount, or turned over any such property, for which such entity or transferee is liable under section 522(i), 542, 543, 550, or 553 of this title." 11 U.S.C. § 502(d).

debtor's authority to recover preferential transfers" because they were filed with an improper motive. The Defendants contend that rather than furthering the bankruptcy principle of equality of distribution, these actions were retaliatory in nature and therefore should not stand.

In response, Kmart argues that the Defendants are precluded from litigating the issue of whether Kmart can bring these complaints because this court definitively ruled on that issue in a prior decision which now stands as law of the case. Kmart alternatively argues that the Defendants are improperly attempting to collaterally attack the Confirmation Order. The Defendants did not object to confirmation of the Plan so they waived their arguments with respect to the plan provisions at issue. Kmart also contends that not all elements of *res judicata* are satisfied here, and even if they were, the Plan retention provision accomplished its desired result, i.e., the reservation of these preference complaints. Finally, Kmart asserts that these recovery actions indirectly benefit the estates and therefore represent a proper exercise of Kmart's business judgment in furtherance of its fiduciary duties.

## B. *Pertinent Provisions of the Plan and Disclosure Statement*

### (i) *The Plan*

Defendants' claims against the estate are in Class 5 of the Plan.[4] Class 5 is comprised of trade vendor and lease rejection claims in the aggregate amount of approximately $4.3 billion. The Plan at Article 5.5 on page 28 provides for the treatment of Allowed Class 5 Claims, as follows:

> **Class 5 (Trade Vendor/Lease Rejection Claims).** Except as otherwise provided in and subject to *Article 9.8* of this Plan [5], commencing on the Distribution Date or first Periodic Distribution Date occurring after the later of (i) the date a Trade Vendor/Lease Rejection Claim becomes an Allowed Trade Vendor/Lease Rejection Claim or (ii) the date a Trade Vendor/Lease Rejection Claim becomes payable pursuant to any agreement between the Debtors (or the Reorganized Debtors) and the holder of such Trade Vendor/Lease Rejection Claim, each Trade Vendor/Lease Rejection Claimholder shall receive, in full satisfaction, settlement, release and discharge of, and in exchange for, such Allowed Trade Vendor/Lease Rejection Claim, (a) its Pro Rata share of the Trade Vendor/Lease Rejection Claimholder Shares, subject to dilution, with the amount of each Trade Vendor/Lease Rejection Claimholder's Pro Rata share equal to the total number of Trade Vendor/Lease Rejection Claimholder Shares multiplied by a fraction, the numerator of which is equal to the amount of such

---

**4.** A review of the claims register maintained by the claims agent, Trumbull Group, indicates that Intercraft filed a proof of claim on June 28, 2002, in the total amount of $9,201,850.39, which includes a general unsecured claim in the amount of $8,731,206.77. Newell Rubbermaid filed a proof of claim on June 28, 2002, in the total amount of $6,338,996.76, which includes a general unsecured claim in the amount of $6,237,791.34. The claims register does not indicate the filing of a proof of claim by Anchor Hocking Corp. The Intercraft and Newell Rubbermaid claims

are the subjects of pending objections to claims filed by Kmart.

**5.** Article 9.8 at page 45 of the Plan states in part, that no payments or distributions will be made to holders of disputed claims, "unless and until all objections to such Disputed Claim ... have been settled, or withdrawn or have been determined by a Final Order, and the Disputed Claim ... has become an Allowed Claim ..." The Plan contemplated that resolution of Disputed Claims could take place after confirmation of the Plan.

Trade Vendor/Lease Rejection Claimholder's Allowed Trade Vendor/Lease Rejection Claim, and the denominator of which is equal to all Allowed Trade Vendor/Lease Rejection Claims; and (b) its Pro Rata Share of the Trust Recoveries, if any . . . The Debtors' failure to object to a Trade Vendor/Lease Rejection Claim in their Chapter 11 Cases shall be without prejudice to the Reorganized Debtors' right to contest or otherwise defend against such Claim in the Bankruptcy Court or other appropriate non-bankruptcy forum . . . when and if such Claim is sought to be enforced by the Trade Vendor/Lease Rejection Claimholder.

A separate Plan provision, Article 7.14 on page 39 of the Plan, as modified by the Confirmation Order, provides for the retention of causes of action in favor of Reorganized (the "Retention Provision"):

7.14 *Preservation of Causes of Action.* In accordance with section 1123(b)(3) of the Bankruptcy Code and except as otherwise provided in this Plan with respect to the Kmart Creditor Trust, the Reorganized Debtors will retain and may (but are not required to) enforce all Retained Actions, except that the Debtors shall and do hereby waive all Avoidance Claims as of the Effective Date (other than Avoidance Actions under Section 549 of the Bankruptcy Code with respect to the matters subject to that certain case captioned *Capital Factors, Inc. v. Kmart Corporation,* Case No. 02 C 1264, 2002 WL 32487863 (N.D.Ill. June 3, 2002)); **pro-vided, however, that such waiver does not include Avoidance Claims against Persons who are parties to Causes of Action involving the Debtors and are pending on the Effective Date,** nor does it include Causes of Action against any Persons who may be the subject, at any time, of Trust Claims. The Debt-

ors or the Reorganized Debtors, in their sole and absolute discretion, will determine whether to bring, settle, release, compromise, or enforce such Retained Actions (or decline to do any of the foregoing), and will not be required to seek further approval of the Bankruptcy Court for such action. The Reorganized Debtors or any successors may pursue such litigation claims in accordance with the best interests of the Reorganized Debtors or any successors holding such rights of action.

(emphasis supplied). According to Article 1.139 of the Plan, Retained Actions

. . . means all Claims, Causes of Action, rights of action, suits and proceedings, whether in law or in equity, whether known or unknown, which any Debtor or any Debtors' Estate may hold against any Person, including, without limitation, (a) Claims and Causes of Action brought prior to the Effective Date, . . . *provided, however,* that the foregoing shall not include Trust Claims (including Avoidance Claims that are Trust Claims), which will be transferred to the Kmart Creditor Trust, Avoidance Claims, or Claims explicitly released under this Plan or by Final Order of the Bankruptcy Court prior to the date hereof.

Avoidance Claims are defined at Article 1.10 of the Plan (as modified by the Confirmation Order) as

. . . Causes of Action against Persons arising under any of sections 510, 547, 548, 549, 550 and 551 (to the extent the latter two sections are applicable to the other statutory sections referred to in this *Article 1.10*) of the Bankruptcy Code, or under similar or related state or federal statutes and common law, including fraudulent transfer laws, whether or not litigation has been commenced

as of the Confirmation Date to prosecute such Avoidance Claims.

Causes of Action are defined at Article 1.24 of the Plan as

> ... any and all actions, proceedings, causes of actions, suits, accounts, controversies, agreements, promises, rights to legal remedies, rights to equitable remedies, rights to payment and claims, whether known, unknown, reduced to judgment, not reduced to judgment, liquidated, unliquidated, fixed, contingent, matured, unmatured, disputed, undisputed, secured or unsecured and whether asserted or assertable directly or derivatively, in law, equity or otherwise including Avoidance Claims and Trust Claims, unless otherwise waived or released by the Debtors or the Reorganized Debtors.

### (ii) *The Disclosure Statement*

The Disclosure Statement contains information about the Plan, including a summary of the overall structure of the Plan and a description of the global restructuring settlement. The Disclosure Statement advises that the Debtors concluded that in order to emerge from chapter 11 quickly "so that the going-concern value may be preserved for the benefit of all constituencies," it was in the best interests of the estates to propose the global settlement. One aspect of that global settlement, which the Debtors characterized as "integral" to the Plan, was the waiver of Avoidance Claims, found in Article 7.14 of the Plan (the "Avoidance Claims Waiver"). The Disclosure Statement, at page 102, stated with respect to the Avoidance Claims Waiver:

> In connection with the Debtors' waiver of Avoidance Claims other than Trust Claims, the Debtors prepared an analysis of the estimated projected recoveries on account of potential preference claims under Section 547 of the Bankruptcy Code ... A company as large as Kmart, with pre-petition annual sales of almost $37 billion, over 200,000 employees, and relationships with over 4,000 merchandise vendors, can be expected to make a very large number of payments within the 90–day preference period. For instance, Kmart made over $1 billion in payments to Fleming, at the time Kmart's largest supplier. Kmart also made over $422 million in payments on account of taxes; over $410 million in real estate lease payments; over $8.3 billion in intercompany transfers among Kmart affiliates; over $2.2 billion in payments to the Prepetition Lenders on account of revolver borrowings and loan paydowns; over $106 million in interest on account of the Prepetition Notes; over $248 million to Kmart's joint venture partner that operates the footwear departments in Kmart stores; and over $108 million in employee benefits payments (not including payroll). None of these amounts include payments made to trade vendors and service providers.

The Disclosure Statement represented that "[t]he Debtors identified all transfers made by them to all persons within the 90–day preference period." The Disclosure Statement, at page 103, stated with respect to Kmart's preference analysis:

> Based upon this analysis, the Debtors identified approximately $6 billion in preferential payments that could be subject to recovery under the Bankruptcy Code. This amount does not include certain other payments that could potentially qualify as preferential transfers. Specifically, this amount was derived from a review of only those payments made to trade vendors and service providers, and was not based on a review of certain other payments in the categories identified above. Of the $6 billion in

payments identified by the Debtors, the Debtors determined the creditors receiving such payments could assert up to approximately $1.86 billion in "new value" that they provided to the Debtors, and that they therefore could conceivably offset such new value against the $6 billion in aggregate payments made to them by the Debtors. Additionally, the Debtors determined that there is a risk that certain of such creditors could successfully assert that as much as approximately $2.18 billion of the remaining payments of $4.14 billion were made in the "ordinary course."

. . .

After applying the estimated costs of litigation to the potential preference actions, and after considering the risks of pursuing such litigation against preference defendants, the Debtors estimate that the potential recovery with respect to the payments that are net of possible "new value" and "ordinary course" defenses is between 12% to 21%, or between $240 million and $405 million in the aggregate, of the total potential preferential payments assuming the Debtors' estimates with respect to the potential defenses are correct.

Finally, at page 103 of the Disclosure Statement, the Debtors described the global settlement, the Avoidance Claims Waiver, exceptions thereto, and the rationale for waiving the Avoidance Claims:

As part of the global settlement contemplated by the Plan among representatives of the Prepetition Lenders, holders of Prepetition Notes, and holders of Trade Vendor/Lease Rejection Claims, the Debtors have agreed to waive all Avoidance Claims as of the Effective Date. Such waiver does not include Causes of Action pending on the Effective Date, nor does it include Causes of Action against any Persons who may be

the subject, at any time, of Trust Claims. Although such waiver entails the release of the value of potential preference recoveries, the Debtors believe that the reorganized business will derive more value in the form of, among other things, go-forward credit support from trade vendors and service providers, than if the Debtors retained and prosecuted Avoidance Claims. This go-forward value inures to the benefit of all creditors under the Plan insofar as solid trade credit support will assist in improving cash flow and cementing business relationships which enhance the value of the reorganized enterprise as a whole. The Debtors therefore believe that waiver of the Avoidance Claims is in the collective best interests of all stakeholders.

To summarize in general terms, the Debtors retained causes of action for enforcement by Kmart. As part of a global settlement incorporated in the Plan, the Debtors agreed to and did waive, among other causes of action, avoidance claims, believing that to do so would benefit the estates in the form of on-going trade credit. This on-going trade credit was deemed more valuable to the estates than the potential recovery on the waived avoidance claims.

Therefore, in accordance with the global settlement, the waived avoidance claims were excluded from the Retention Provision. The Debtors also provided, however, for certain exceptions to the waived avoidance claims (the "Waiver Carveout"), which had the practical effect of restoring the Waiver Carveout claims to the Retention Provision.

According to the Plan, the Avoidance Claims within the Waiver Carveout consist of those Avoidance Claims asserted by the Debtors in adversary proceedings pending on the Effective Date, the Section 549

claims related to the *Capital Factors Inc.* appeal, and Trust Claims. Nowhere in the Disclosure Statement, Plan or Confirmation Order are the preference recipients that were or could potentially be within the Waiver Carveout identified by name. The court also notes that none of those documents name which parties are within the larger category of the Avoidance Claims Waiver and the category of Retained Actions.

## C. *The Confirmation Hearing and Eastman Kodak Ruling*

Numerous objections to confirmation of the Plan were filed prior to the Plan Objection Deadline, including an objection filed by Eastman Kodak Company. In its objection, Kodak argued against confirmation of the Plan because the Plan impermissibly treated Kodak's claim differently than other claims in the same class, inappropriately classified Kodak's claims with other claims which were not substantially similar, and unfairly discriminated against Kodak in its treatment of the claims.

After hearing arguments on Kodak's objection, the court orally ruled as follows:

The objection of Eastman Kodak is overruled. Plan provision 7.14 is effective as to all creditors, and there is a possibility that any of them could be sued prior to the effective date.

Also, as to Class 5, all of the claims are going to be treated the same, and that treatment will then be the same for each of those claimants as it is for any other claimant in that class.

And, lastly, under 1123(a)(4), there's no violation of that provision of the Code just because Kmart might not waive avoidance actions as to any individual creditor. So the objection is overruled.

Transcript of April 22, 2003 hearings at page 270:8–20 (the "Eastman Kodak Ruling").

## D. *The Confirmation Order*

As stated above, the Confirmation Order was entered on April 23, 2003. In the Confirmation Order the court made fifty findings, including the following,

AW. *Preservation of Causes of Action.* It is in the best interests of the creditors and interestholders that the causes of action that are not expressly released under the Plan be retained by the Reorganized Debtors pursuant to Article 7.14 of the Plan in order to maximize the value of the Debtors' Estates. It is also in the best interests of creditors and interestholders that Avoidance Actions be waived pursuant to Article 7.14 of the Plan.

Although "Avoidance Actions" is not defined in the Plan, Disclosure Statement or Confirmation Order, it is clear from the context of the language, that the Avoidance Actions referred to in finding AW. of the Confirmation Order are the same as the Avoidance Claims referred to in Article 7.14 of the Plan.[6]

## III.

## DISCUSSION

### A. *Summary Judgment Standards*

The well-established standard on a motion under Fed.R.Civ.P. 56(c) and Fed. R. Bankr.P. 7056 is that summary judgment is to be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine

---

6. Paragraph 41 of the Confirmation Order at page 57 provides that the provisions of the Plan and the Confirmation Order are to be construed in a manner consistent with each other so as to give effect to the purposes of each.

issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." *E.g., Bellaver v. Quanex Corp.,* 200 F.3d 485, 491 (7th Cir.2000); *Feldman v. American Memorial Life Ins. Co.,* 196 F.3d 783, 789 (7th Cir.1999). In ruling on the motion, the court reviews the record in the light most favorable to the nonmoving party and it draws all reasonable inferences therefrom in the nonmovant's favor. *Schneiker v. Fortis Ins. Co.,* 200 F.3d 1055, 1057 (7th Cir.2000); *Filipovic v. K & R Express Systems, Inc.,* 176 F.3d 390, 395 (7th Cir.1999). "[E]ven where many or all of the material facts are undisputed, the court still must ascertain that judgment is proper as a matter of governing law." *Johnson v. Gudmundsson,* 35 F.3d 1104, 1112 (7th Cir.1994) (citations omitted).

### B. *Law of the Case*

 The doctrine of law of the case establishes a presumption that a ruling made at one stage of a lawsuit will be adhered to throughout the litigation. *Butera v. Apfel,* 173 F.3d 1049, 1053 (7th Cir.1999); *Avitia v. Metropolitan Club of Chicago, Inc.,* 49 F.3d 1219, 1227 (7th Cir. 1995). A prior ruling dealing with the same subject matter and the same parties in the same case is conclusive. *Id.* at 1053. The doctrine requires a court to respect its own decision and the mandate of an appellate tribunal. Importantly, though, the doctrine is limited insofar as it applies to issues decided in the former proceeding, but not to questions which might have been decided but were not. *Roboserve, Inc. v. Kato Kagaku Co., Ltd.,* 121 F.3d 1027, 1032 (7th Cir.1997).

The court concludes that the Eastman Kodak Ruling does not deal with the same subject matter raised by the Defendants herein. The issue in the Eastman Kodak Ruling concerned whether Kodak's claims were inappropriately classified, unfairly discriminated against and/or treated differently from claims within its class in violation of sections 1122(a), 1129(b)(1) and 1123(a)(4) of the Code, respectively. Those issues are distinct from the issues raised by the Defendants in these motions, i.e., the potential *res judicata* effect of the Confirmation Order and the propriety of Kmart bringing these preference lawsuits. Accordingly, the Eastman Kodak Ruling is not conclusive.

### C. *Res Judicata*

#### (i) *General*

 The doctrine of *res judicata* bars a party from relitigating claims that were or could have been asserted in an earlier proceeding. *Brown v. Felsen,* 442 U.S. 127, 131, 99 S.Ct. 2205, 60 L.Ed.2d 767 (1979). "Under *res judicata,* a final judgment on the merits bars further claims by parties or their privies based on the same cause of action." *Montana v. United States,* 440 U.S. 147, 153, 99 S.Ct. 970, 973, 59 L.Ed.2d 210 (1979). The doctrine protects litigants from "expense and vexation attending multiple lawsuits, conserves judicial resources, and fosters reliance on judicial action by minimizing the possibility of inconsistent decisions." *Id. Res judicata* can be applied in a bankruptcy context. *D & K Properties Crystal Lake v. Mutual Life Ins. Co. of New York,* 112 F.3d 257, 258 (7th Cir.1997) (*citing Barnett v. Stern,* 909 F.2d 973, 978 (7th Cir.1990)).

 *Res judicata,* although related to, is analytically distinct from collateral estoppel. *Adair v. Sherman,* 230 F.3d 890, 893 (7th Cir.2000) (citation omitted). Collateral estoppel bars relitigation in a different cause of action involving a party to a cause of action wherein an issue was actually and necessarily determined by a court of competent jurisdiction. *Id.*

The fundamental precept of both *res judicata* and collateral estoppel "is that a right, question or fact distinctly put in issue and directly determined by a court of competent jurisdiction ... cannot be disputed in a subsequent suit between the same parties or their privies ..." *Montana*, 440 U.S. at 153, 99 S.Ct. at 973 (*citing Southern Pacific R. Co. v. United States*, 168 U.S. 1, 48–49, 18 S.Ct. 18, 27, 42 L.Ed. 355 (1897)). So, the hallmark of both preclusion doctrines of *res judicata* and collateral estoppel is a judgment.

Parties may also be precluded from relitigating claims or issues by virtue of their conduct, as opposed to a judgment. One example of an estoppel doctrine is judicial estoppel, where a party is estopped from assuming a position contrary to one he previously and successfully asserted in the same legal proceeding. *Matter of Cassidy*, 892 F.2d 637, 641 (7th Cir.1990), *cert. denied*, 498 U.S. 812, 111 S.Ct. 48, 112 L.Ed.2d 24 (1990). Another example is equitable estoppel, "which precludes one party from asserting a claim or defense against another party who has detrimentally altered her position in reliance on the former's misrepresentation or failure to disclose a material fact." *Kennedy v. United States*, 965 F.2d 413, 417 (7th Cir. 1992) (*citing Portmann v. United States*, 674 F.2d 1155, 1158 (7th Cir.1982)).

The estoppel doctrines are distinct from the preclusion doctrines. Generally speaking, "the difference between estoppel and principles of res judicata is that estoppel is based on conduct of a party in the course of litigation, while claim and issue preclusion follow from the fact of the judgment without reference to anyone's conduct." *In re Associated Vintage Group, Inc.*, 283 B.R. 549, 565 (9th Cir. BAP 2002).

Here, the Defendants argue that the avoidance claims in these preference complaints are barred by the *res judicata* effect of the Confirmation Order. The party seeking to establish that the doctrine of *res judicata* applies, has the burden of proving all of its elements. *Id.* That party also carries the burden of establishing that no exception to *res judicata* exists. *Id.* Finally, doubts are resolved against preclusion. *Id.*

**(ii) *Reservation of Causes of Action***

It is well established that "res judicata does not apply when a cause of action has been expressly reserved for later adjudication." *D & K Properties*, 112 F.3d at 259–60. The Code provides that if a debtor chooses to retain causes of action for post-confirmation enforcement, it may do so in its plan. *See In re USN Communications, Inc.*, 280 B.R. 573, 590 (Bankr. D.Del.2002).

Section 1123 of the Code provides in pertinent part,

(b) Subject to subsection (a) of this section, a plan may— ...

(3) provide for—

(A) the settlement or adjustment of any claim or interest belonging to the debtor or to the estate; or

(B) the retention and enforcement by the debtor, by the trustee, or by a representative of the estate appointed for such purpose, of any such claim or interest.

11 U.S.C. § 1123(b)(3).

Without the ability to reserve the estate's claims for later enforcement, afforded by section 1123(b)(3), the debtor may have to adjudicate every claim to finality prior to plan confirmation or risk losing that claim. *See In re Amarex, Inc.*, 74 B.R. 378, 380 (Bankr.W.D.Okla.1987), *aff'd* 88 B.R. 362 (W.D.Okla.1988) (citation omit-

ted)(" § 1123(b)(3)(B) serves the useful function of allowing confirmation of a plan before possible claims against others have been fully investigated and pursued. To say confirmation must await a final decision of all possible preference complaints would either inordinately delay confirmation, with all the attendant expense, or result in a windfall in favor of those who received preferential transfers.").

Section 1123 of the Code describes the provisions that can be included in a plan of reorganization. Section 1125 addresses the requirements and parameters of post-petition disclosure and solicitation relating to reorganization plans. Specifically, section 1125 provides, *inter alia*, that votes for the plan cannot be solicited unless the plan or a written summary of the plan is first transmitted, along with a written disclosure statement containing adequate information concerning the plan. Bankruptcy Rule 3017 contains directives concerning proper notice of the hearing on the adequacy of the information in the disclosure statement. Although section 1123(b)(3) is not an express disclosure or notice statute, it has been viewed by some courts as serving a disclosure and notice function. *See Harstad v. First American Bank,* 39 F.3d 898, 903 (8th Cir.1994). The debtor, by including a section 1123(b)(3) retention provision in its plan, is in effect disclosing and giving notice of its intent to reserve estate claims for post-confirmation enforcement.

The disclosure and notice afforded by a section 1123(b)(3) retention provision, however, is directed towards the estate's creditors, not the potential defendants on the reserved claims. *In re Goodman Bros. Steel Drum Co., Inc.,* 247 B.R. 604, 608 (Bankr.E.D.N.Y.2000)(noting that under Bankruptcy Rule 3017, unless the potential preference defendants are also creditors, they are not entitled to notice of the plan confirmation hearing or to receive copies of the plan and disclosure statement). With respect to the disclosure and notice to the creditor body afforded by section 1123(b)(3), the *Harstad* court observed:

Creditors have the right to know of any potential causes of action that might enlarge the estate—and that could be used to increase payment to the creditors. Even if, as the [debtors] claim, they gave notice of such claims by indicating in their disclosure that the availability of such claims was being investigated, the creditors are entitled to know if the debtor intends to pursue the preferences in post-confirmation actions. Compliance with § 1123(b)(3) gives notice of that intent. Only then are creditors in a position to seek a share of any such recoveries, contingent though they may be, and to have the mechanics of the preference-sharing spelled out in the plan. Creditors are in no position to do so if they are not on notice that the debtor retains the power to pursue recovery.

*Harstad,* 39 F.3d at 902.

While the statute states that the debtor can retain any claim belonging to the debtor or the estate, the statute is silent on what language the debtor must employ in such a provision. Courts are divided on how a section 1123(b)(3) retention provision must be written in order to accomplish the desired result, i.e., retention of a cause of action for later adjudication and enforcement. *Goodman,* 247 B.R. at 607. Some courts hold that in order to be effective, the plan provision must "specifically and unequivocally" retain the action. *See Harstad,* 155 B.R. at 509; *In re Paramount Plastics, Inc.,* 172 B.R. 331, 335 (Bankr.W.D.Wash.1994). The retention is "specific and unequivocal" if it "reserves the right to litigate that specific claim," *USN,* 280 B.R. at 590, or in other words,

identifies the cause of action and potential defendant by name. Under this standard, a general reservation of causes of action is insufficient. *See Browning v. Levy*, 283 F.3d 761, 774 (6th Cir.2002)(reservation that did not name the defendant or state the factual basis for a breach of fiduciary duty claim did not defeat res judicata), *In re Huntsville Small Engines, Inc.*, 228 B.R. 9, 13 (Bankr.N.D.Ala.1998) (preference action precluded by *res judicata* where "plan only contained a general retention clause reserving the debtor's right to pursue post-confirmation all pre-petition causes of action without specifically disclosing the cause of action against [the defendant].”), *In re A.P. Liquidating Co.*, 283 B.R. 456, 460 (Bankr.E.D.Mich.2002) (plan that made no mention of debtor's claim against defendant and only provided for general reservation of rights held insufficient), and *Westland Oil Development Corp. v. MCorp Management Solutions, Inc.*, 157 B.R. 100, 103 (S.D.Tex.1993).

Other courts hold that a reservation containing a description of the type or category of claims is sufficiently specific and unequivocal. *See, e.g., USN*, 280 B.R. at 591 and 594 (concluding that a Plan providing that a liquidating trust has the exclusive right to enforce any and all causes of action, including but not limited to all avoidance powers granted to the debtors under the Code, sufficiently demonstrated the intent to preserve the rights to enforce preference actions and therefore satisfied section 1123(b)(3)), *In re Ampace Corp.*, 279 B.R. 145, 156–62 (Bankr.D.Del. 2002)(plan provision retained, *inter alia*, all Avoidance Actions and all transfers recoverable under Section 550 of the Bankruptcy Code), *see also, In re Weidel*, 208 B.R. 848, 851–52 (Bankr.M.D.N.C. 1997)(post-confirmation objection to claim not barred by *res judicata* where plan expressly reserved general right to bring post-confirmation objections to claims).

Courts upholding the sufficiency of such categorical descriptions rely, at least in part, on the fact that plan confirmation often occurs prior to the complete identification of avoidance actions. For example, in *Ampace*, the court noted that requiring exacting specificity is unreasonable and impractical. 279 B.R. at 159 ("Indeed, in large chapter 11 cases, the investigation and litigation of all possible avoidance actions to final judgment can take years. To force the debtor to remain in bankruptcy until a final determination of all possible preference actions is made would act as a detriment to both the debtor and its creditors by slowing down the reorganization process."), *see also, USN*, 280 B.R. at 591, n. 26 (court observed that in many large chapter 11 cases there may be hundreds, if not, thousands of transactions within the 90–day period and considerable time and effort is needed to examine those transactions in light of the numerous defenses provided for in § 547(c)), *Associated Vintage*, 283 B.R. at 564 ("We agree with the other courts that regard it as impractical and unnecessary to expect that a disclosure statement and plan must list each and every possible defendant and each and every possible theory."), *see also, In re Worldwide Direct, Inc.*, 280 B.R. 819, 823 (Bankr.D.Del.2002)(In deciding whether the debtor's rights to assert certain defenses to claims was sufficiently reserved, the court concluded that "... it is simply impractical and unwarranted to require a debtor to provide in excruciating detail all of the possible defenses or objections which the estate may have to every single claim being treated in the plan."), and *Weidel*, 208 B.R. at 852 ("[T]he confirmation process is expedited by allowing a general reservation of rights to serve as notice to creditors that their claims may be challenged.... [A] general reservation of a right to contest claims puts all parties on

notice that a creditor's claim may be challenged. The time between the filing of a case and confirmation will be shortened by giving effect to general reservations of rights. Creditors may vote and object with this provision in mind. If the creditor finds the provision objectionable, it may object and force the issue regarding its claim.").

The Seventh Circuit dealt with the sufficiency of the language of a retention provision in *Matter of P.A. Bergner & Co.*, 140 F.3d 1111 (7th Cir.1998), *cert. denied,* 525 U.S. 964, 119 S.Ct. 409, 142 L.Ed.2d 332 (1998), where it stated:

> [T]he language of § 1123(b)(3)(B) is broad enough to encompass both those situations where a debtor is trying to preserve a potential future claim about which the affected party had no notice and the subset of claims that have already been filed (and are thus a matter of public record) but that remain unresolved. . . . While there might be some logic in requiring 'specific and unequivocal' language to preserve the claims belonging to the estate that have never been raised, the statute itself contains no such requirement.

*Id.*, at 1117 (citations omitted). In *Bergner,* the following plan provision was at issue:

> Effective as of the date of the approval of the Disclosure Statement by the Bankruptcy Court, the Debtors waive the right to prosecute and release any avoidance or recovery actions under sections 544, 545, 547, 548, 549, 550, 551 and 553 of the Bankruptcy Code or any other causes of action, or rights to payments of claims, that belong to the Debtors or the Debtors in Possession, other than any such actions that may be pending on such date.

The Court concluded that this provision validly retained the cause of action which was pending on the date the disclosure statement was approved. Accordingly, the reorganized debtor was not precluded from enforcing that action after the plan was confirmed. *Id.*

In its *D & K Properties* opinion, the Seventh Circuit concluded that in order to avoid the *res judicata* effect of the plan confirmation order, the provision in the plan that retains causes of action must be "express" in two senses, i.e., it must be in writing and it must specifically identify the cause of action to be retained. *D & K Properties,* 112 F.3d at 261. The Seventh Circuit noted that the problem with the plan provision at issue in *D & K Properties* was "that the claim sought to be reserved was not identified in the reservation." *Id.* Notably, the plan provision did not use the word "reserve" or its synonym. Indeed, the provision merely identified the party responsible for enforcing claims of the debtor after confirmation, i.e., the disbursing agent. There was apparently no complementary provision in the plan describing, let alone reserving the claims that were placed with the disbursing agent for enforcement. The Court acknowledged that the provision as written did not reserve claims, but chose to examine whether the provision could "also serve as express reservations of claims capable of surviving the res judicata bar." *Id.* at 260, n. 3. In the end, because "D & K failed to identify any claim it was reserving," the reservation was lacking in specificity and the cause of action was thus barred under the doctrine of *res judicata.*

The *D & K Properties* panel also noted that a "blanket" reservation of all causes of action is not specific enough to satisfy the "express" requirement. *Id.* (*citing In re Kelley,* 199 B.R. 698 (9th Cir. BAP 1996), which contained a plan provision reserving "all causes of action which the debtor may

choose to institute,").[7] The Court in *D & K Properties* observed, "[a] blanket reservation that seeks to reserve all causes of action reserves nothing. To hold otherwise would eviscerate the finality of a bankruptcy plan containing such a reservation, a result at odds with the very purpose of a confirmed bankruptcy plan." *Id.* at 261.

While the Seventh Circuit in *D & K Properties* did not conclude what level of specificity would satisfy the "express" requirement, the Court did provide some insight. In *dicta*, the Court compared the *D & K Properties* retention provision to a plan retention provision used in *In re Envirodyne Industries, Inc.*, 174 B.R. 986 (Bankr.N.D.Ill.1994):

> There the bankruptcy court commented on the defendant's arguments about res judicata, stating that they 'might be persuasive if future causes of action were not reserved for in the Disclosure Statement, Plan and Order ...' Yet even a casual reading of the reservation at issue reveals that the right to preclude claims is both express and specific, even if broadly so, including claims 'without limitation' and 'of any kind whatsoever not otherwise released pursuant to the terms of the Plan.' The reservation in D & K lacks the specificity, even if broadly stated, of that in *Envirodyne*. **The *Envirodyne* reservation, broad as it was, was clear in what it purported to reserve. And because it was explicit, the parties not only had an opportunity to dicker over the language, but they were thereafter on notice about which claims were reserved and which were not.** In any event, *Envirodyne* provides scant support because the court explicitly stated that it was not reaching the doctrine of res judicata.

*Id.* at 261 (citations omitted)(emphasis supplied). As noted earlier, the Court also cited to the *Kelley* case, where the debtor attempted to reserve causes of action with the language, "all causes of action which the debtor may choose to institute." One might ask what the difference is between the *Kelley* "blanket" reservation and the *Envirodyne* "broad" reservation.

Superficially, they are similar; but they differ in an important respect—the level of clarity in what is being reserved. While the *Envirodyne* reservation was clear in what it purported to reserve, the *Kelley* reservation was not. A creditor reading the *Kelley* reservation may reasonably question whether the debtor intended to reserve claims at all. The open-ended statement that the debtor reserves actions it may choose to institute leaves creditors in the dark about whether post-confirmation recoveries will in fact be retained for potential enforcement and therefore avail-

---

7. Many courts have cited to the Ninth Circuit Bankruptcy Appellate Panel's *Kelley* decision for the proposition that general reservation provisions are insufficient. In the Panel's subsequent *Associated Vintage* opinion, the court clarified *Kelley*, "[w]hile we did find the purported reservation in the *Kelley* plan to be insufficiently vague in the context of the facts of that case, and observed that another court had once found a general reservation to rights to be insufficient, our comment was pure dictum made in the course of the case-by-case *Restatement (Second)* § 24 transactional analysis of the claim, and cannot be construed as a general statement of law. *Kelley* must be construed as consistent with our decision in *Heritage Hotel*, in which we pointed out that it is entirely possible that a general reservation of rights might be sufficient in another case. Moreover, the argument in this appeals illustrates the danger of engrafting an unduly burdensome specificity requirement onto the § 1123(b)(3) authorization for retention and enforcement of claims belonging to the estate. The statute does not require it. As [this] appeal demonstrates, no defendant will ever concede a reservation is specific enough." *Associated Vintage*, 283 B.R. at 563–64 (citations omitted).

able for distribution. On the other hand, a creditor reading the *Envirodyne* reservation is left with little doubt that the debtor intends to reserve estate claims for future enforcement.

■ Moreover, reading *Bergner* and *D & K Properties* together, certain conclusions can be reached with respect to the requisites of a valid retention provision.[8] First, and most obviously, there must be a reservation of something. Plans with no retention provisions at all will not suffice to protect the claim from the binding effect of the plan. *See Paramount Plastics,* 172 B.R. at 335 (plan at issue contained "no reference to preference actions, either in the description of creditor treatment, the means for implementing the plan, the liquidation analysis, or the retention of jurisdiction"). Attempts to manufacture an 1123(b)(3) reservation by resorting to other plan provisions, such as those relating to reservation of jurisdiction or appointment of estate representative, are vulnerable to failure. *See D & K Properties* (where debtor unsuccessfully argued that appointment of disbursing agent to assert claims constituted express reservation).

■ Second, a blanket or general provision, i.e., one that does not clearly evince the debtor's intent to reserve claims, will not suffice to defeat the preclusive effect of the confirmation order. *Bergner* stands for the proposition that plan provisions identifying causes of action by type or category are not mere blanket reservations. Therefore, categorical reservation can effectively avoid the *res judicata* bar. Dispensing with a requirement of cataloging claims by name comports with the

Court's view in *Bergner* that section 1123(b)(3) does not require "specific and unequivocal" identification. It also comports with the Court's observation that the section is "broad enough to encompass both those situations where a debtor is trying to preserve a potential future claim about which the affected party has no notice **and** the subset of claims that have already been filed." *Bergner,* 140 F.3d at 1117. Importantly, in *Bergner,* although there was some emphasis placed on the fact that the subject lawsuit was pending and being actively litigated prior to plan confirmation, the Seventh Circuit concluded that "[t]he language of [the] plan **itself** provided all the notice to which [the defendant] was entitled under the statute to preserve the ongoing proceeding between the parties." *Id.* (emphasis supplied).

■ In this matter, the Retention Provision of Article 7.14 is very broad, but it is clear in what it reserves and what it relinquishes. It clearly includes the Retained Actions, and while waiving Avoidance Claims, it specifically excepts from such waiver and reserves: 1) those Avoidance Claims pending on the Effective Date, 2) Section 549 Avoidance Actions relating to the *Capital Factors* appeal, and 3) Avoidance Claims (and other Causes of Action) against potential Trust Claim defendants (i.e., the Waiver Carve–Out). The Retention Provision thus provided all the notice to which Defendants (as creditors) were entitled, under section 1123(b)(3)(B), concerning the preservation of the instant preference actions. Defendants knew or should have known that they were potential preference targets, *see*

---

8. Interestingly, the *USN* court relied on *Bergner* to find that a categorical description was sufficient, but also cited to *D & K Properties* as an example of a case requiring plan proponents to specifically reserve the right to litigate that specific claim, which in the *USN* court's opinion, would invalidate a categorical description. To this court, the holdings of *Bergner* and *D & K Properties* are not contradictory, but can be read together to arrive at the proper linguistic parameters of a plan retention provision.

*USN,* 280 B.R. at 593,[9] and inasmuch as Avoidance Claims "pending on the Effective Date" were specifically excepted from the Avoidance Claims waiver and reserved for potential enforcement, the Defendants were on notice that they remained subject to suit up to and including the Effective Date. If the Defendants disagreed with the reservation of these avoidance actions, they could have negotiated with the Debtors (or "dickered over the language") and/or objected to the Plan. They did not.

In reaching its conclusion, the Court has considered and rejected Defendants' contention that the omission of the Waiver Carve–Out from the definition of "Retained Actions" renders the separate Retention Provision ambiguous. Specifically, Debtors defined Retained Actions, in Article 1.139 quoted above, to exclude Avoidance Claims. Defendants therefore suggest that Article 7.14, which begins by reserving the "Retained Actions," does not reserve any Avoidance Claims. That reading of the Plan is, however, patently unreasonable. Article 7.14, after reserving "Retained Actions," goes on to expressly "except" from that reservation the Avoidance Claims. Accordingly, while the Avoidance Claims were technically not imported, via the "Retained Actions" definition, into the Retention Provision of Article 7.14, the intent to initially include them is clear; if Avoidance Claims were not included in the retention, Debtors would have had no reason to "except" them in the very next clause. Even more importantly, however, Debtors added, *inter alia,* a further, explicit proviso that certain

Avoidance Claims, including those pending on the Effective Date, would not be waived at all. That proviso makes Debtors' intent to reserve such claims unmistakable.

■■■ Reorganization plans have been analogized to contracts for purposes of applying the principles of contract construction and interpretation. *See D & K Properties,* 112 F.3d at 262. Accordingly, the court should examine the Plan as a whole, "giving effect to all parts and language ... according to their 'ordinary and natural meaning.'" *Wonderland Shopping Center Venture L.P. v. CDC Mortgage Capital, Inc.,* 274 F.3d 1085, 1092 (6th Cir.2001). When the intention is apparent from a reading of the entire agreement, the intention "will control the meaning of any particular word or phrase unguardedly used and seeming to indicate a different intention." *Klever v. Klever,* 333 Mich. 179, 189, 52 N.W.2d 653, 658 (1952)(*quoting Detroit Trust Co. v. Manilow,* 272 Mich. 211, 218, 261 N.W. 303).[10]

Again, the intention here is unmistakable: Debtors have, in the proviso clause of Article 7.14,—the operative plan retention provision,—specifically excepted from the Avoidance Claims waiver and reserved, *inter alia,* all avoidance actions pending on the Effective Date. Indeed, to accept the Defendants' proffered interpretation of these provisions would render the clear and unequivocal proviso clause a nullity.

For all of these reasons, the instant preference actions were successfully reserved in the Plan and survived any possi-

---

**9.** Moreover, the mere failure to precisely identify in the Schedules or Disclosure Statement the preferential transfers against these Defendants does not provide a basis for estopping Kmart, judicially or otherwise, from bringing the instant suits. While it is conceivable that other circumstances might exist

which would in fact estop Kmart from bringing these particular (albeit successfully reserved) preference actions, no such circumstances have been alluded to or alleged.

**10.** The Plan provides that Michigan law governs its construction. Article 15.10.

ble *res judicata* bar.[11]

### D. *Propriety of Bringing these Preference Complaints*

The Defendants correctly point out that preference recovery actions are creatures of bankruptcy, designed to benefit the estate—not the Debtors,—and ensure equality of distribution to creditors. While the Defendants acknowledge that the decision to bring recovery actions is in Kmart's discretion, the Defendants argue that "there is no reorganization principle-related legitimacy to these 'bastard' claims." Rather, the only motive in bringing these claims was to retaliate against those creditors who did not agree to extend on-going trade credit to Kmart. Accordingly, the Defendants argue that Kmart should not be allowed to maintain these complaints.

There is one statutory limitation on bringing an avoidance action found at section 550(a) of the Code, which provides, in part, as follows:

(a) Except as otherwise provided in this section, to the extent that a transfer is avoided under section 544, 545, 547, 548, 549, 553(b), or 724(a) of this title, the trustee may recover, for the benefit of the estate, the property transferred, or if the court so orders, the value of such property . . .

11 U.S.C. § 550(a). Accordingly, section 550(a) has the effect of limiting actions to only those actions that benefit the estate. *Bergner*, 140 F.3d at 1117. In *Bergner*, the appellant argued that because they already received the full amount of their plan distributions, the unsecured creditors could not benefit from the subject preference action. In other words, because the

unsecured creditors already received their distributions, there would be no reorganization principle-related legitimacy to the recovery actions.

The Court agreed with the appellant's assessment that the preference action only benefited the owners of the reorganized debtor. The Court pointed out, however, that the owners of the new reorganized debtor were creditors of the old debtor. As part of their treatment in the Plan, those former creditors received equity interests in the reorganized debtor in exchange for funding a plan distribution. The Court held that section 550's broadly construed benefit requirement is satisfied when the preference action benefits the owners of the reorganized debtor, who were at one time creditors of the old debtor. The Court noted that,

[a] contrary holding would be in serious tension with the right of the debtor under § 1123 to continue pursuing claims after plan confirmation, as that right would mean little if it could be defeated by showing that recovery would not go to the original creditor group in its original form.

*Id.*

In another indirect benefit case, *In re Trans World Airlines Inc.*, 163 B.R. 964 (Bankr.D.Del.1994), the court concluded that although creditors did not receive direct cash payments from the preference recoveries, the section 550 benefit requirement was nonetheless satisfied where the preference recoveries were used to reduce the debtor's obligation on a note. *Id.* at 969. The court rejected the argument that the speculative and unquantifiable nature of the recovery nullified the benefit, noting

---

11. Inasmuch as these preference actions were effectively reserved in the Plan, the court need not address Kmart's contention that the elements of *res judicata* have not been estab-

lished in this case. Moreover, the court need not address Kmart's argument that the Defendants are improperly raising a collateral attack on the Confirmation Order.

that "[t]here is nothing in the Code to support an argument that the size of the recovery relative to the size of the debtor should be considered in allowing preference actions." *Id.* at 973, n. 13. Similarly, in *In re Southern Industrial Banking Corp.*, 59 B.R. 638 (Bankr.E.D.Tenn.1986), the court held that the recovery of avoidance actions increased the financial health of the new company and the value of the equity interests held by former creditors of the old company. *Id.* at 640–641. The court rejected the argument that preference recoveries did not foster equality of distribution under those circumstances. *Id.*

Recovery on the preference actions here will provide benefit to Kmart at least in the form of enhanced stock value. That value will inure to the benefit of Kmart's shareholders, including those shareholders who acquired their equity interests on account of their Allowed Class 5 Claims. Accordingly, Kmart has satisfied, albeit indirectly, the benefit requirement of section 550 to warrant bringing these actions.

## IV.

### CONCLUSION

For the reasons stated herein, the Defendants have not established as a matter of law that they are entitled to summary judgment on *res judicata* or propriety of suit grounds. The motions of Intercraft Company, Newell Rubbermaid, Incorporated, and Anchor Hocking Corp. for summary judgment are therefore denied.